NOT DESIGNATED FOR PUBLICATION

No. 123,391

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of H.C., R.H., and I.C.,
Minor Children.

MEMORANDUM OPINION

Appeal from Ford District Court; LAURA H. LEWIS, judge. Opinion filed May 28, 2021. Affirmed.

*Natalie K. Randall*, of Dodge City, for appellant Mother.

*Kathleen Neff*, deputy county attorney, and *Kevin Salzman*, county attorney, for appellee.

Before ARNOLD-BURGER, C.J., HILL, J., and MCANANY, S.J.

PER CURIAM:  The mother, whom we will refer to in this opinion simply as "Mother," appeals the district court's order terminating her parental rights to her three children, whom we will refer to in this opinion as R.H., born in- 2007; H.C., born in 2013; and I.C., born in  2014.

In a separate but companion appeal, the father of H.C. and I.C., whom we will refer to in this opinion as "Father," also appeals the district court's termination of his parental rights to these two children. Father is not the natural father of R.H. but rather her stepfather. Nevertheless, we will refer to him from time to time in this opinion because R.H. was one of the three children in the Mother's and Father's household.

The district court found Mother was unfit, her unfitness was unlikely to change in the foreseeable future, and the termination of her parental rights was in the children's best

1

interests. Mother contends: (1) the State failed to present sufficient evidence to support a finding of unfitness, and (2) the State should have pursued community support services to reintegrate the children with Mother. After carefully reviewing the evidence in the record, we find clear and convincing evidence to support the district court's findings that Mother was unfit as a parent under Kansas law and that the conditions leading to that finding were unlikely to change in the foreseeable future. We also find no abuse of discretion in the district court's decision to terminate Mother's parental rights, and we therefore affirm its judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*Facts Leading to the Termination Proceedings*

In May 2015 the Department for Children and Families (DCF) first contacted this family after law enforcement found the oldest child, R.H., a block from home wearing her underwear and a swimsuit top while the parents were asleep. The house was a safety concern for the children due to dog feces, urine, trash, and clutter throughout the house. The family cleaned the house to address these concerns.

In August 2016, DCF again became involved with the family when it was reported that the home conditions were filthy, unsafe, and unhealthy. DCF again found that the parents needed to clean the home to alleviate the concerns. The family was referred to branch services, which were less intensive than family preservation services.

On February 28, 2017, the family was referred to family preservation services after a domestic dispute between Mother and Father, which led to Father's arrest. Father returned home upon being released, which was a violation of a no-contact order. Mother eventually agreed to drop the no-contact order and agreed to participate in family services.

In April 2017, DCF became involved again with reoccurring concerns about physical neglect of the children and their unsafe living environment. There were reports that R.H. was coming to school dirty and that relatives who used methamphetamine were living in the house. In an interview, R.H. reported someone staying in the house smoked "spice," but she said Mother had smelled it and asked the person to move out. R.H. also said there was a broken water pipe in the basement of the residence. She reported that she was out of her prescribed medication that week. During an investigation, the school reported difficulty dealing with Mother due to her lack of veracity. R.H. was missing school and her individualized education plan (IEP) meetings. Mother reported to the social worker that a pipe was broken, and she was unable to use the kitchen sink or the washing machine. The child protection specialist reported that the basement showed evidence of a flood. Once again, at DCF's request, the family cleaned the home.

In July 2017, DCF was again notified of the same complaints. The children were seen running around outside with full diapers, and there was a concern about drug users living in the home. The conditions in the house were somewhat improved, but the porch was covered with trash and had an odor of rotting food. Cockroaches and mice were seen on the porch. DCF made another referral to family preservation services for the family.

On September 5, 2017, officers responded to a report that a small, naked child was wandering alone in the area. They found four-year-old H.C., who could not speak but who pointed in the direction of his home. Back at the house, the officers noted that the porch had piles of trash and dirty clothes. Inside, Father was asleep on the couch and was hard to rouse. Mother told the officers that she was working with DCF, but "they'd been no help at all." Mother admitted that she knew that H.C. could climb up on furniture and open the door to get outside.

On October 24, 2017, the State of Kansas filed a petition alleging that H.C. was a Child in Need of Care (CINC) based on the claim that he was "without the care or control necessary for the Child's physical, mental or emotional health" and that he "has been physically, mentally or emotionally abused or neglected or sexually abused." The State alleged that an emergency existed which threatened the safety of the child.

On December 20, 2017, the court ordered informal supervision for 180 days with the following conditions: (1) the parents were to cooperate with family preservation services; (2) the parents should enroll H.C. in Bright Beginnings; and (3) the parents should take H.C. to a pediatrician, follow dietary recommendations, and secure the house so that H.C. could not escape.

On March 13, 2018, the State filed CINC petitions involving R.H. and I.C. after DCF deemed that the parents' progress with family preservation services was inadequate. In its petition, the State alleged that an emergency existed which threatened the safety of the children. According to school records, R.H. had missed 16 days of school and had fallen behind. DCF noted concerns about the cleanliness of the household, including a broken sewer pipe in the basement which allowed raw sewage to dump directly into the basement. The case plan included Mother and Father working with the Strengthening Families Program, attending family therapy, and obtaining employment to meet their financial needs.

On March 14, 2018, the court held a temporary custody hearing. All three children were removed from Mother's and Father's custody and placed in the custody of DCF. In its order, the district court noted that an emergency existed which threatened the safety of the children as follows: "House stinks of sewage from broken pipe in basement, & parents just received $21,000 settlement. House crawling with cockroaches."

4

DCF placed R.H. with her uncle. DCF had trouble finding a placement for the boys because neither H.C. nor I.C. could speak clearly, they were not potty trained, they could not dress themselves, and they did not use utensils to eat. H.C. and I.C. were both very overweight, they would not willingly take baths, and they needed IEPs for school. During temper tantrums, the boys would hit their caretakers and hit each other.

On April 13, 2018, Saint Francis Ministries (SFM), the contracting agency for out-of-home placement for DCF, filed its report with the court. SFM was to assist Mother and Father in the reintegration process. A court-ordered case plan was developed for both parents to work towards reintegration with their children. The court assigned Mother and Father the following tasks to work toward that goal:

- complete mental health evaluations;
- follow through with the recommendations from the mental health evaluations;
- complete a parenting class and provide a certificate of completion;
- complete a parenting evaluation;
- complete a budget;
- develop an "expectations and consequence chart" for each child;
- demonstrate that Mother and Father can follow through on the consequence chart;
- develop a healthy meal plan for the children;
- keep the children supervised at all times during visits;
- not associate with anyone known for gang affiliation, criminal activity, or drug users;
- get estimates from three different plumbers in the area;
- have the plumbing and pipes in the home repaired;
- clean up all trash and feces in the home; and

5

- maintain a clean, safe, and stable home.

On April 25, 2018, the parents stipulated to H.C. and I.C. each being a CINC. The court adjudicated each of the three children to be a CINC. R.H.'s father did not appear at this hearing or at any time during these proceedings.

On August 9, 2018, the court held a review hearing. According to SFM, Mother and Father had attended a case planning conference prior to adjudication, and they were attending a parenting class as ordered. But the majority of their tasks had not been completed. They remained unemployed and had not completed mental health evaluations. Moreover, there were a number of ongoing concerns with the condition of the home, including the unrepaired sewer line. Due to a lack of progress, DCF recommended that the permanency goal should be changed to a dual goal of reintegration and adoption, and the court adopted that recommendation.

On November 14, 2018, the court held another review hearing. According to SFM, Mother and Father made some progress on the case plan tasks. They completed mental health evaluations and parenting classes, they created a chores chart for the members of the household, and the sewer line in the house had been repaired. But they were allowing two men to live in the home who had not completed background checks. DCF believed that the parents were not being truthful when they said there were no other people living in the home other than the grandmother. Each time staff knocked on the door to the home, there was an extended period of time before the door was answered. At a home visit in August 2018, a SFM staff member waited in a car positioned so that she could see the backdoor to the house. When DCF and SFM staff knocked on the front door, she saw two young men come out the backdoor and leave the house. During a home visit in October 2018, a man was found hiding in a closet underneath a comforter. In addition, the home was still not clean and safe. The floor had not been restored after the sewer repairs, and the furnace was not working.

The SFM case manager's report noted that the case had been ongoing for eight months with some progress by the parents; but due to the tender age of the children, the permanency goal should be changed to adoption because reintegration was no longer possible. The Court Appointed Special Advocate (CASA) volunteer's report largely agreed with the SFM report. The CASA volunteer noted that the home conditions were still not safe for visitation with the children and concluded that reintegration was no longer viable. At the conclusion of the hearing, the court found that the permanency plan should remain with the dual goal of reintegration/adoption. The district court instructed both SFM and the CASA volunteer to inspect the home and provide the parents with a written list of continuing safety concerns about the home.

On February 13, 2019, the district court again reviewed the matter. The court ordered that a new case planning conference be held in order to take into account the results of the recently completed psychological evaluations of the children.

On February 20, 2019, the new case planning conference took place. New tasks were added for the parents, including: placement of alarms on the doors of the home, participation in counseling with a focus on parenting cognitively delayed children, random home visits, and revision of menus based on nutritional guidelines provided by SFM.

On February 27, 2019, the court held a permanency hearing. The court ordered an additional task that the parents undergo psychological evaluations based in part on recommendations in the children's psychological reports. The court found that reintegration was still viable, and the parents had completed most of their case plan tasks.

On April 7, 2019, unsupervised weekly visits with Mother and Father began. But on this first unsupervised visit, H.C. cut himself with a knife after being allowed to use it

to cut sausages. Mother characterized it as "just a scratch." H.C.'s foster parents took him to the doctor the following day, and the doctor said that the cut should have had stitches at the time of the injury. SFM stopped visitation while they investigated the accident. Visits resumed again on May 5, 2019, but the visits were monitored.

On June 12, 2019, the court held another review hearing. SFM noted continued concerns, including: (1) the furnace remains broken and the parents are using space heaters throughout the home; (2) it appears that another individual is living in the home; (3) Mother and Father are argumentative about completing their psychological evaluations; (4) Mother and Father have purchased a locking alarm system, but it has not yet been installed; (5) the house has an odor of cat urine and feces; and (6) the accident with H.C. and the decision to give him a knife is an example of the parents' inability to make wise decisions in parenting the children. The CASA volunteer's report also noted concerns about the parents' refusal to complete psychological evaluations and their inability to maintain a clean, safe, and stable home. Following this review hearing, the court found that reintegration may no longer be viable, and the case plan goal was changed to adoption/permanent custodianship.

On September 24, 2019, Mother filed her psychological evaluation with the court. Father filed his on October 18, 2019.

*The Termination Proceedings*

On September 24, 2019, the State moved to terminate the parental rights of Mother and Father to the three children. The State asserted numerous factors of unfitness which it claimed were applicable to Mother and Father, and that their conduct was unlikely to change in the foreseeable future:

8

- A presumption of unfitness should apply because the children had been in an out-of-home placement, under court order, for a cumulative total period of one year or longer, and the parents substantially neglected or willfully refused to carry out a reasonable plan, approved by the court, directed toward reintegration of the children into the parental home (see K.S.A. 2020 Supp. 38-2271([a][5]);

- Failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family (see K.S.A. 2020 Supp. 38-2269[b][7]);

- Lack of effort on the part of the parent to adjust their circumstances, conduct, or conditions to meet the needs of the children (see K.S.A. 2020 Supp. 38-2269[b][8]);

- Failure to assure care of the children in the parental home when able to do so (see K.S.A. 2020 Supp. 38-2269[c][1]);

- Failure to carry out a reasonable plan approved by the court directed toward the integration of the children into the parental home (see K.S.A. 2020 Supp. 38-2269[c][3]); and

- Failure to pay a reasonable portion of the cost of substitute physical care and maintenance based on their ability to pay (see K.S.A. 2020 Supp. 38-2269[c][4]).

The State asserted that because these factors were not likely to change in the foreseeable future, it was in the best interests of the children that the parental rights of Father and Mother be terminated.

On November 25, 2019, the court began the hearing on the State's termination petition. The hearing included testimony from DCF social worker Jodi Inguanza, SFM family support worker Fermina Perez, and SFM case manager Elizabeth Crosswhite. The SFM reports spanning the time the children had been in out-of-home placement were

9

admitted into evidence. The most recent report indicated that the parents had completed the tasks ordered by the district court.

Perez, the assigned SFM family support worker, testified that when the children were removed from the home in March 2018, she had difficulty placing them because of their behaviors, including the lack of potty training, hitting their caregivers, and explosive temper tantrums. The children could not speak clearly, would not use utensils to eat, refused to take a shower or bath, and could not dress themselves. It took Mother and Father five to six months to begin on their case plan tasks, but the parents eventually completed them. Since attending parenting classes, Mother and Father were more interactive with their children. The children appeared to have a strong bond with their Mother, more so than with their Father. But the children talk to and play with their Father during visits.

Crosswhite, the SFM case manager, testified that she had doubts about the parents' ability to parent the children. Her concerns included: (1) the parents' apparent inability to potty train I.C. and H.C.; (2) Mother giving H.C. a knife to help with cooking tasks, resulting in his injury; (3) people coming in and out of the home frequently; (4) the furnace being broken; (5) H.C. playing with the space heater and sticking his fingers into the part of the heater where he could get burned; and (6) Mother picking up cat feces and then feeding the children without washing her hands.

The testimony of Inguanza was consistent with the testimony of the other witnesses and with the allegations in the petition. The hearing could not be completed on November 25, 2019.

The hearing resumed on July 13, 2020. Crosswhite continued her earlier testimony. She opined that the parents had not worked hard on their case plan tasks and it took them a long time to complete them. Moreover, Father delegated some of their joint

10

tasks to Mother, such as creating a budget and a consequence chart, without participating himself. In Crosswhite's view, reintegration was not viable partially due to the lack of cleanliness of the home. When she visited the home in March 2020, the toilet was not working, the house had an odor of cat urine, the parents prioritized purchasing a Nintendo Switch game device and a new couch over necessary car repairs, and the parents were unavailable for random home visits. Crosswhite recommended termination of the parents' parental rights. She testified:

> "I don't believe that the parents are ready to deal with the children's developmental disabilities that they have. I don't believe that the cleanliness of the home is up to standard. And, I don't believe that there are—they are ever going to stop having people come into the home that should not be there."

Inguanza, a child protection specialist with DCF, testified about similar concerns. She noted that the parents lacked a sense of accountability and responsibility for their situation. She noted the parents were often very defensive and defiant, and they argued about what needed to be done. Inguanza testified:

> "[B]ased on my observations with the parents, they struggle in putting the children's needs first over their own. Often times, it was apparent that the parents were still sleeping when you would go to the home, and it would be almost noon . . . and the kids were up and not being supervised while the parents were sleeping."

Dr. Lori Hertel, a psychologist at Serenity Psychological Services, conducted psychological evaluations on both parents in September 2019. She diagnosed Mother with an unspecified personality disorder with antisocial and obsessive-compulsive features and a history of attention deficit hyperactivity disorder. Mother's IQ was below average. Mother had difficulties in communication and had abnormalities in her thought processes. In Hertel's opinion, these problems would cause Mother difficulty in the day-to-day parenting of her developmentally delayed children.

11

At the close of the State's case, the parents moved for judgment as a matter of law based on the lack of sufficient evidence to support the State's claims. The court denied the motion.

Mother called Janese Boger to testify. Boger is a therapist and social worker who began working with Mother in August 2018 and with Father in July 2019. She testified that the parents regularly attended her scheduled therapy sessions. Boger believed they are capable of parenting the children with support. She testified that the family would benefit from community-based services at the mental health center in Dodge City where a caseworker could provide in-home services including attendant care, respite care, and weekly therapy. She testified that the parents wanted their children back in the home. She believed the children could be reintegrated into the home, would benefit from family therapy, and would be safe in the home if they had the proper support.

Dana Schatz, a Triple-P (Positive Parenting Program) coach, testified as to Mother's and Father's involvement in the parenting program. Schatz began working with the parents in May 2019. Since then she has had three in-person visits with the family and one by video. According to Schatz, the home was clean during her three visits, and the parents appeared to be using the strategies and techniques that they learned in the parenting program. Schatz provided the parents with a level of instruction specifically for children with developmental delays. Schatz thought these parents had not been given a fair opportunity to show that they could parent their children.

The hearing was continued further to allow the guardian ad litem (GAL) to meet with the children and to give the court the opportunity to interview the children.

On September 24, 2020, the court held the concluding session of the hearing. At that time, the State moved to reopen its case-in-chief due to major changes in the parents'

situations and "a total disintegration of the family." The court granted the motion. Before proceeding with new evidence, the judge met with the children and the GAL in chambers.

When the hearing reconvened, Mother testified that on August 4, 2020, she had a domestic incident with Father during which he broke a window out of her car. As a result, Mother moved out of the house to stay with her brother in Hutchinson. At the time of this final hearing, Mother was living in a motel in Hutchinson with her new boyfriend whom she had been dating for a month. Mother was unemployed, though she was receiving unemployment benefits. Her boyfriend was paying part of the charges for her motel room. She had an interview scheduled with a temp agency, and she hoped she would be able to rent a three-bedroom trailer home that would be available on October 1, 2020. According to Mother, her new boyfriend would not be living with her, and she would request a background check on him before she would allow him to be around the children. She opined that she and Father could coparent the children in spite of these recent events.

With respect to Father, he remained in the marital home in Dodge City after this domestic incident. He told Mother that he was going to kill himself by jumping off a bridge. As a result, he was admitted to Larned State Hospital for four days where he was diagnosed with depression. He testified that he hoped to reconcile with Mother after they were both healthy. He was not ready to take the three children into his home because he needed to get financially fit and improve his mental health. He opined that the children would be better off with Mother, and he hoped to work out a visitation and parenting plan in order for him to help parent the children.

At the conclusion of the hearing, the court acknowledged the strides Mother and Father had made but noted that two years was a long time for the children to be without a stable and safe environment. The district court expressed concerns with the recent

13

separation and move, their lack of employment, and the fact that neither parent was in an immediate position to take care of these three children.

The district court terminated Mother's and Father's parental rights to the children, finding Mother and Father to be unfit by reason of their conduct or conditions which rendered them unable to care properly for the children. Although the State asserted a presumption of unfitness under K.S.A. 2020 Supp. 38-2271(a)(5) in its petition and in response to the parents' motion at the close of the State's case, the State effectively abandoned the presumption and ultimately did not ask the district court to make that finding. The district court did not apply the presumption but instead found that the factors of unfitness set out against Mother and Father were supported by clear and convincing evidence and that the circumstances and conduct of the parents were unlikely to change in the foreseeable future. Finally, the court found that termination of parental rights was in the best interests of the children. Mother's appeal brings the matter to us.

ANALYSIS

Mother argues that the district court erred by terminating her parental rights because there was not clear and convincing evidence to support the finding that she was unfit and that her unfitness was unlikely to change in the foreseeable future. Although the framing of her issues is unclear, she also seems to challenge the district court's finding that termination of her parental rights was in the children's best interests and instead claims the State should have pursued community support services to reintegrate the children with Mother. She asks that we reverse the termination order.

Parents who have assumed parental responsibilities "have a fundamental right to raise their children that is protected by the United States Constitution and the Kansas Constitution." *In re Adoption of C.L.*, 308 Kan. 1268, 1279, 427 P.3d 951 (2018). In Kansas, when a child has been adjudicated to be a child in need of care, a district court

14

may terminate parental rights "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2020 Supp. 38-2269(a). Thus, the district court may terminate parental rights only if it makes three findings: (1) clear and convincing evidence establishes that the parent is unfit by reason of conduct or conditions which renders the parent unable to care properly for the child; (2) the conduct or condition that makes the parent unfit is unlikely to change in the foreseeable future; and (3) terminating the parental rights is in the best interests of the child. K.S.A. 2020 Supp. 38-2269(a), (g)(1); *In re D.H.*, 54 Kan. App. 2d 486, 488, 401 P.3d 163 (2017).

K.S.A. 2020 Supp. 38-2269(b) provides a list of nonexclusive factors a court shall consider in determining unfitness. The court must also consider a separate list of nonexclusive factors when a child is not in the parents' physical custody, which is the case here. K.S.A. 2020 Supp. 38-2269(c). Any one of the factors set forth in K.S.A. 2020 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 2020 Supp. 38-2269(f).

In determining whether the district court's findings are supported by clear and convincing evidence, we determine whether the evidence, viewed in the light favoring the State, could have convinced a rational fact-finder that the facts found by the district court were highly probable. In making this determination, we do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine factual questions. *In re Adoption of Baby Girl P.*, 291 Kan. 424, 430-31, 242 P.3d 1168 (2010).

A court considering termination of parental rights must also "consider whether termination of parental rights . . . is in the best interests of the child" by focusing on the child's physical, mental, and emotional needs. K.S.A. 2020 Supp. 38-2269(g)(1). "If the

15

physical, mental or emotional needs of the child would best be served by termination of parental rights, the court shall so order." K.S.A. 2020 Supp. 38-2269(g)(1).

With these standards in mind, we turn to the merits of Mother's appeal.

Mother stipulated that the children were in need of care, and she does not dispute that on appeal. Essentially, she argues the State failed to present clear and convincing evidence that she was unfit because she had completed the case plan tasks assigned to her. In addition, she contends the agencies involved had not made reasonable efforts to reintegrate her with her children.

The State presented extensive evidence on two of these factors to prove that Mother was unfit: (1) failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family (K.S.A. 2020 Supp. 38-2269[b][7]); and (2) lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the children (K.S.A. 2020 Supp. 38-2269[b][8]). In addition, because the children were not in Mother's physical custody, the State also presented evidence in support of these additional factors: (1) failure to assure care of the child in the parental home when able to do so (K.S.A. 2020 Supp. 38-2269[c][1]); and (2) failure to carry out a reasonable plan approved by the court directed toward the integration of the child into the parental home (K.S.A. 2020 Supp. 38-2269[c)][3]).

Since May 2015, Kansas agency workers have been involved with this family on numerous occasions and well before the first CINC case was filed in October 2017. While Mother worked with family preservation services after the CINC case was filed, several witnesses testified that she was slow to start her assigned tasks and often took months to complete them. She resisted tasks, especially the court-ordered psychological evaluation.

16

Although Mother eventually completed all of the court-ordered tasks, she reversed course in August 2020, when she moved out of the marital home and became unemployed. At the time of the final termination hearing, Mother was unemployed, living in a motel, and trying to start over in a new city that was away from her established therapy and family support services. Although Mother did well in parenting classes and in completing her assigned case plan tasks, she no longer had a clean, safe, and stable home for the children. Much of the progress she made toward reintegration was negated by her new circumstances. Father acknowledged at the hearing that he was not able to take immediate custody of the children into his home, and Mother would be the better placement for them. Accordingly, the evidence strongly supports the district court's findings that (1) reasonable agency efforts toward reintegration had failed, (2) Mother had failed to adjust her circumstances to meet the children's needs, (3) Mother failed to assure care of the child in the parental home when able to do so, and (4) Mother had failed to carry out a reasonable court-approved plan aimed at reintegration.

In making its decision, the district court acknowledged that the children had been out of the home since March 2018, and the children needed permanency and a stable home. We recognize that Mother completed all of the case task plans at one point in time and presented a plan to the district court to provide a stable home in the future. But at the time of the final hearing, Mother did not have a clean, stable, and safe home to provide to her three developmentally delayed children.

Before Mother left the marital home, Mother's therapist had testified that Mother would be capable of caring for the children in her home with extensive support with community-based services. But agency employees assisting the family expressed ongoing concerns about her ability to parent these children, the cleanliness of the home, and her untruthfulness as to other individuals staying in the marital home. At the time of the final hearing, Mother was unemployed; she was separated from Father; she was living in a motel in a different city, the cost of which was being subsidized by her new boyfriend;

17

and she no longer had a home to offer the children. The community-based services that had been identified and set up in Dodge City would have to be reestablished in Hutchinson. The children all had significant behavioral challenges when taken into state custody, and those behaviors were improving during the time they had been in out-of-home placement.

At the time of the final hearing, Mother either neglected or willfully refused to carry out a reasonable plan, approved by the court, directed toward reintegration of the children into the parental home because she no longer had a clean, safe, and stable home for the children. See K.S.A. 2020 Supp. 38-2269(b)(8). In addition, the evidence also showed that Mother was unwilling or unable to adjust her circumstances, conduct, or conditions to meet the needs of H.C., R.H., and I.C. See K.S.A. 2020 Supp. 38-2269(b)(8). We find ample evidence to support the district court's finding of unfitness.

Mother also challenges the district court's finding that her unfitness was unlikely to change in the foreseeable future. Mother essentially asks this court to reweigh the evidence, pointing to the fact that she had a plan for housing and moving the community support to her new community. Our role, however, is not to reweigh the evidence.

In addressing Mother and Father, the court stated:

"[U]nfortunately . . . I'm not able, given the history and—and the recurrence of the problems in this case, it does not appear to this Court that things are going to change enough in the foreseeable future, that stability is going to be provided to these children in either one of your homes, whether you're separated or together."

The court pointed out that the cases had lasted over two years, and the evidence of change was not change for the better. At the time of the final hearing, the parents were separated and neither parent was employed. Mother was living in a motel, which she

18

could not pay for on her own and she could not assure the court that she could provide a stable home for the children.

The district court recognized that the passage of time viewed from the perspective of a small child must be considered in its decision. "[A] child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time." *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008). Kansas measures this time "from the child's perspective, not the parent['s], as time perception of a child differs from that of an adult." *In re S.D.*, 41 Kan. App. 2d 780, Syl. ¶ 9, 204 P.3d 1182 (2009); see K.S.A. 2020 Supp. 38-2201(b)(4).

There is no set amount of time that constitutes the "foreseeable future." This court has considered periods of time as short as seven months to be the foreseeable future from a child's perspective. 41 Kan. App. 2d at 790. Children have the right to permanency in a time frame reasonable to them. In making this determination, the court may look to a parent's past conduct—as the district court did in this case—as indicative of future behavior. See *In re K.L.B.*, 56 Kan. App. 2d 429, 447, 431 P.3d 883 (2018).

Viewing the evidence in a light favoring the State, we find clear and convincing evidence to support the district court's findings that Mother's unfitness was unlikely to change in the foreseeable future.

Mother also seems to challenge the district court's finding that termination was in the best interests of the children. She argues that the State should have pursued additional community support services to reintegrate the children with her.

Once the district court finds that a parent is unfit and unlikely to change in the foreseeable future, it must determine whether termination of parental rights is in the best interests of the children involved. K.S.A. 2020 Supp. 38-2269(g)(1). The statute provides

19

that in making that determination, the court shall give primary consideration to the physical, mental, or emotional health of the child. K.S.A. 2020 Supp. 38-2269(g)(1).

The determination of the best interests of the child is entrusted to the district court's sound judicial discretion. *In re M.S.*, 56 Kan. App. 2d 1247, 1264, 447 P.3d 994 (2019); *In re K.R.*, 43 Kan. App. 2d 891, 903, 233 P.3d 746 (2010). A district court abuses its discretion if it bases its decision on an error of fact or law or if no reasonable person would agree with its decision. *In re P.J.*, 56 Kan. App. 2d 461, 465-66, 430 P.3d 988 (2018). The court should weigh the benefits of permanency for the child without the presence of a parent against the continued presence of the parent and the attendant issues created in the child's life. The court should further consider the relationship between the parent and children and the trauma that may be caused by termination. *In re K.R.*, 43 Kan. App. 2d at 904.

In its ruling, the district court addressed the parents directly, explaining to them what the court was required to consider in making its decision. The district court spoke of meeting with the children earlier and the obvious trauma the children were processing. The district court noted the bond between the parents and the children. The district court stated the best interests of the children had to be considered, and that the children's greatest need was to be in a stable, safe environment. The district court considered the passage of time in this case from the children's perspective, and that consideration is in line with Kansas caselaw and the guidance the Legislature provided in K.S.A. 2020 Supp. 38-2201(b)(4). Considering the evidence in the record, we have no difficulty concluding that the district court did not abuse its discretion in finding that termination of parental rights was in the children's best interests. A rational fact-finder could have found that delaying permanency would not be in the best interests of these children.

Finally, Mother complains that the State relied on the presumption of unfitness, which would have put the burden on her to rebut that presumption. Under K.S.A. 2020

Supp. 38-2271(a), a presumption of unfitness applies when certain conditions are present. But the record shows that the State abandoned its presumption of unfitness. We find nothing in the record supporting Mother's argument that the district court erroneously applied the presumption of unfitness. Rather, it appears that the district court correctly proceeded solely under K.S.A. 2020 Supp. 38-2269, which does not contain a presumption of unfitness.

Viewed in the light favoring the prevailing party—in this case the State—we find clear and convincing evidence to support the district court's finding that Mother was unfit by reason of her conduct or circumstances, that her inability to care for these children was unlikely to change in the foreseeable future, and that the termination of Mother's parental rights was in the children's best interests. Finally, there is no evidence that the district court applied a presumption of unfitness in terminating Mother's parental rights. We find no errors in the district court's disposition of this case.

Affirmed.